# EXHIBIT C

MEMORANDUM FOR RECORD                                  March 16, 2006


SUBJECT:   Interview with Cary Jellison regarding Bailey Claim


1. At about 1500 hours Mr. Cary Jellison, Professional Fishing Guide, called me in response to a message that I had left for him. I had called Mr. Jellison to see if he had any knowledge of the accident that took Mr. Bailey's life because Mr. Silverstein had informed me that Mr. Jellison had remarked that he had seen Mr. Bailey's raft pass by him on the Yuba River. Mr. Jellison stated that, not only had he seen Mr. Bailey rafting on the river, but that he had predicted his death.

2. Mr. Jellison stated that was with a customer (he had taken a father and son out "wade fishing" because no way would he take out a "floater" with the river in the swollen conditions that it was in) when he saw Mr. Bailey and his sons float by in a "$49.00, K-Mart raft." He stated that the raft had almost tipped over right in front of him and his customers and Mr. Bailey had dropped a paddle in the river. He said that the raft had only about 2" of freeboard (extent of raft above water level) and that the occupants of the raft had no control of it, that the raft was just spinning around and around in circles. Mr. Jellison said that he stated to his customers, "We'll read about them in the paper tomorrow and will hear their names on the news tonight" and said that he made a comment to the effect that "child services" should do something about removing the children from their father's care for child endangerment.

3. Mr. Jellison said that the manager of the campground where Mr. Bailey was staying later told him that they had warned Mr. Bailey of the danger of taking the raft out on the river and had, in fact, refused to allow him to inflate the raft at their facility because they were worried about liability if something happened to the Bailey's. He said that it was his understanding that the Bailey's had then taken the raft to the "store" to inflate it.

4. Mr. Jellison said that when he saw them, none of the occupants of the raft had life jackets on and the raft was too small for any jackets to be lying in the bottom of the raft. Mr. Jellison went on to explain that Mr. Bailey was sitting with his legs extended and his legs stretched from one end of the raft to the other and the two boys were sitting between Mr. Bailey's legs. He said that each time one of the boys or Mr. Bailey moved the raft would almost tip and the occupants would all laugh and "carry-on". Mr. Jellison said that he was surprised to read that the raft went over the Daguerre Dam because he didn't think that "they would ever get that far" without capsizing the boat.

5. I asked Mr. Jellison if he had any idea where Mr. Bailey had put the raft in the water. Mr. Jellison said that he was "below the bridge and could see the bridge from where he stood. He said that he assumed that the raft was put in at "the bridge" because he was standing just down river from the bridge and you "need a special permit" to put in above the bridge. I asked if there was signage on the bridge warning of the submerged dam downriver and Mr. Jellison said that he wasn't sure if there was or not. He said a "big

yellow sign" went up on the bridge a couple of days after the accident. He said that there was signage about ¼ mile from the dam but because "they had no control of the raft and obviously didn't know what they were doing", Mr. Bailey would not have been able to react in time to get to shore at the point of those warnings. Mr. Jellison said that those signs might have been washed out in any case. Mr. Jellison stated that he believes that he was the last person to see Mr. Bailey alive and he was not in any way surprised when he heard that he had drowned.

6. I thanked Mr. Jellison and asked him if I could call him again if I had further questions and he replied in the affirmative.

*[signature]*
Phyllis Svetich
Paralegal Specialist